UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DAVID WILLIAMS,

                    Petitioner,

                                        **DECISION AND ORDER**

         -vs                            **No. 10-CV-0790(MAT)**

MARK BRADT,

                    Respondent.
_____

## I.   Introduction

     Petitioner David Williams ("Williams" or "Petitioner"),
represented by counsel, seeks a writ of habeas corpus pursuant to
28 U.S.C. § 2254 on the basis that he is being unconstitutionally
detained in Respondent's custody. Williams is incarcerated pursuant
to a judgment entered against him in New York State Supreme Court,
Monroe County, on October 18, 2005, following a jury trial
convicting him of criminal sexual act in the first degree, sexual
abuse in the second degree, and endangering the welfare of a child.

## II.  Factual Background and Procedural History

### A.   The Trial

#### 1.   The Prosecution's Case

     In early 2004, the victim, Z.O., and his half-brother, W.N.
lived in Umatilla, Florida, with their mother, T.N., and her
boyfriend. The family had a friend named Don Green ("Green") whom

the boys regarded as a substitute grandfather. T.97, 137.[1] Green had introduced Z.O. to Petitioner at a cookout approximately one year before, during one of Petitioner's vacations in Florida. T.97, 136-37, 150.

Petitioner invited Z.O. to visit him at his home in Henrietta in the summer of 2004, and Z.O.'s mother gave her son permission to go. Although Z.O. had known Petitioner for a year before the planned trip, W.N. had only recently met Petitioner. T.150. Petitioner admitted that he initially only asked Z.O. to visit. T.313.

On July 6, 2004, Petitioner flew to Florida to escort Z.O. to Rochester. T.313. Until that point, Z.O. had believed that he was going to visit New York City, not upstate New York. T.67-69, 102, 138. W.N. testified that he and his mother decided that W.N. should accompany Z.O., and Petitioner acquiesced and bought W.N. a ticket. T.313.

Once they arrived in Henrietta, the boys stayed with Petitioner in an RV trailer on the rear of his property and used the main house for showering. T.79, 81-82, 138. W.N. stated that they stayed in the trailer because Petitioner's house "was a mess" and "really cluttered[.]" T.139.

---

[1]

Citations to "T.__" refer to pages from the transcript of Petitioner's trial.

Not long after they arrived, Petitioner took Z.O. on a week-long trip to boy-scout camp while W.N. was left alone on Petitioner's property, where the neighbors checked in on him occasionally. T.152. When Petitioner and Z.O. returned, they slept together every night in the same bed in the trailer. T.143. Z.O. slept naked. W.N. slept alone in a separate area in the trailer. T.80-82, 92, 120.

One day, while Z.O. was showering in the main house, Petitioner came into the bathroom, took off his clothes, got into the shower with Z.O. and repeatedly touched Z.O.'s testicles. When he asked Z.O. for permission to fellate him, Z.O. said no, but Petitioner did so anyway. T.82-85, 85-87. After performing oral sex on Z.O., Petitioner told the boy not to tell anybody about the act, especially Z.O.'s brother, mother and her boyfriend. T.88.

Z.O. testified about a different occasion in the trailer when Petitioner attempted to sodomize Z.O., who was in bed. T.89-92. Z.O stated that Petitioner "tried to put his dick in [Z.O.'s] butt" but he did not penetrate Z.O. T.90-91. Z.O. recounted another incident on June 28, 2004, in which Petitioner pulled down Z.O.'s pants. T.93-94.

Z.O. did not tell W.N. about sexual abuse committed by Petitioner. When the boys called their mother, Z.O. did not say that anything inappropriate had occurred. T.121-22, 150.

On July 25, 2004, acting on an anonymous tip that the boys might be runaways, two deputy sheriffs from the Monroe County Sheriff's Department visited Petitioner's property. The officers spoke with W.N. and Z.O. and inspected the interior of the trailer. Z.O. did not tell the officers about his sexual activities with Petitioner. T.125-26, 240. Satisfied that everything was fine, the deputies left.

Three days later, on July 28, 2004, Tyler Barrus, a Sheriff's Department Investigator ("Inv. Barrus"), was involved in the follow-up investigation regarding Petitioner. Along with Robert Barnes, a county Child Protective Services worker, Inv. Barrus visited Petitioner's property. T.170, 173, 238-39. When Inv. Barrus knocked on the door to the main house, W.N. answered the door and invited the men inside. Neither Petitioner nor Z.O. was home at the time. Inv. Barrus and Barnes explained to W.N. that they were investigating possible criminal activity on Petitioner's property. T.176-77, 243-44. W.N. proceeded to show them around the house, which was in "complete disarray" with every "surface . . . covered with something." T.177. He then took them to the trailer and allowed them to look around inside. T.145-46, 177-79, 240-41. Inv. Barrus asked W.N. to have Petitioner contact him when he returned. T.179-80.

About twenty minutes later, Petitioner called Inv. Barrus and agreed to come to the police station. When Petitioner arrived about

-4-

fifteen minutes later, Inv. Barrus offered Petitioner something to eat or drink, and to use the bathroom, but he refused these offers. T.232-33.

Inv. Barrus brought Petitioner to an empty office, and explained that he was investigating allegations that Petitioner had engaged in sexual relationships with minors. T.182-83. Inv. Barrus then read Petitioner the Miranda warnings from a form. T.184. Petitioner stated that he understood his rights and was willing to waive them and speak with the investigator. T.186-88.

Petitioner stated that he lived alone and had arranged with the boys' family to have the boys visit him from Florida. T.190. About an hour into the interview, Petitioner admitted that he had taken a shower with the younger brother and had touched penis. T.191. At that point, Inv. Barrus arranged to have the boys brought to the station. T.191-92, 246, 249-50.

When the boys arrived, Investigator Barrus left Petitioner alone for about fifteen minutes and went to speak with Z.O. T.192. Z.O. answered the investigator's questions and signed a handwritten statement; this was the first time that Z.O. had told anyone of his sexual contact with Petitioner. T.108-112, 192.

After his conversation with Z.O., Inv. Barrus returned to Petitioner and asked if he had engaged in any other sexual contact with Z.O. or any other minors. After about an hour and a half, Petitioner admitted that he had put his mouth on Z.O.'s penis on

several occasions. T.193. Petitioner also had tried to put his scrotum in Z.O.'s mouth while he was sleeping one night. T.194. With regard to the shower incident, Petitioner explained that Z.O. became "curious" as to body parts and had "gotten a boner." T.195. This led to Z.O. "wondering what it would feel like to have somebody's mouth on his penis and Mr. Williams accommodated that by putting his mouth on [Z.O.]'s penis." T.195.

Throughout their conversation, Petitioner did not mention to Inv. Barrus that he had any medical concerns or problems. Petitioner exhibited no symptoms of illness and had declined offers to eat, drink or use the bathroom. T.214, 229, 253.

Inv. Barrus transcribed Petitioner's statements onto a form. T.194-95, 196-97. In this written confession, Petitioner stated that as soon as the boys arrived in Henrietta, Z.O. followed Petitioner into the shower and asked questions of a sexual nature. Petitioner stated that he did not want Z.O. in the shower with him, but Z.O., a "very curious boy," insisted. When Z.O. asked Petitioner to touch Z.O.'s penis, Petitioner "would touch him to show him what [he] was talking about." Another time in the shower, Z.O. asked Petitioner about "mouth action," and Petitioner then knelt in the shower and fellated him. Petitioner believed that he performed oral sex on Z.O. twice. Regarding their sleeping arrangements, Petitioner stated that he and the boys slept in the three beds in his trailer because his house was being "remodeled."

Z.O. would often come into Petitioner's bed and when Petitioner asked Z.O. to leave or tried to push him out, Z.O. resisted. When they were in bed together, Z.O. would sometimes ask Petitioner to touch Z.O.'s penis. Once, Z.O. tried to put his mouth to Petitioner's penis, but Petitioner refused to let him do so.

Petitioner described a past sexual relationship as "something similar" that happened ten or fifteen years before with another "very curious boy" who was interested in sex. Petitioner identified this person by name. Petitioner attributed his activities to a desire to provide sexual education for the boys, claiming that "the main thing" for him was to always try to "answer these boys' questions," which he believed was the "right thing to do." He added, "If moms and dads are not teaching their kids the right way about their sexual behavior, someone should."

When this statement was completed, Petitioner reviewed it, read it aloud, made corrections, initialed the corrections, and then signed the statement. T.199. He had no apparent difficulty reading the statement or signing it. T.200. About ten minutes later, Inv. Barrus placed Petitioner under arrest. T.205.

Following the prosecution's direct case, the trial court granted the defense motion to dismiss two of the three counts of first degree criminal sexual act, regarding two other occasions when Petitioner allegedly placed his mouth on Z.O.'s penis. T.260-61.

-7-

Inv. Barrus testified that Petitioner, who had longstanding diabetes, did not appear sick or injured that day. T.202. Because Inv. Barrus's father had diabetes, he was familiar with the signs and symptoms of diabetic shock (e.g., slurred speech and lack of mental orientation); Inv. Barrus observed none of these in Petitioner during the interrogation. T.202-03. Petitioner never asked to consult an attorney or said that he no longer wanted to speak to Inv. Barrus. T.204.

### 2.   The Defense Case

Petitioner testified in his own behalf that after he retired he traveled regularly to Florida during the winter, and for several years stayed in a trailer park in Altoona, where he became friends with Green. T.270-71. In February of 2004, Green introduced Petitioner to Z.O. and his family. T.271-72, 306. After Green introduced Petitioner to this family, Petitioner would visit them every week. T.272.

At some point in early 2004, Petitioner suggested to Green and the boy's mother that Z.O. should come to visit him in New York, where he could enroll in summer school classes because he was failing school in Florida. Petitioner later extended the invitation to W.N. as well, because W.N. wanted to see New York. T.311-13. T.N. agreed to allow her sons to visit and provided Petitioner with documentation for the boys to obtain medical care, if necessary. T.274, 283.

-8-

On July 8, 2004, Petitioner flew from Rochester to Florida and escorted the boys back to Rochester. T.275. Petitioner claimed that his house had sustained water damage during the previous winter and was being remodeled, so they all stayed in the trailer behind the house. Petitioner testified that he and the boys each had their own bed. T.275-77. During the boys' visit, Petitioner took Z.O. on a camping trip for several days, and he took both boys to an amusement park, a mall and a carnival. Petitioner also bought them skateboards and other gifts. T.105-06, 277, 282-83.

On July 28, 2004, Petitioner returned home with Z.O. from a trip to the airport and found a message from Inv. Barrus to contact him. T.283-85. Petitioner immediately called the investigator, who asked Petitioner to come to the sheriff's department. Inv. Barrus told Petitioner that he needed some information and that their meeting would last approximately half an hour. T.286.

At that time, Petitioner had been diabetic for over twenty years, took daily medication for his condition, and monitored his blood sugar. T.287-90. He had eaten a hamburger at approximately 11:00 a.m. that morning but did not eat anything else before 3:00 p.m., when he left for the police station. T.299, 321-22. When Petitioner arrived at the station, he felt fine.

During his interrogation and while the investigator left him alone for a period of time, Petitioner began to feel nauseous. T.328. Petitioner claimed that he lapsed into a diabetic state and

-9-

as a result, he had almost no recollection of the interview. T.326. In addition, he testified, he had no recollection at all of preparing, reading, or signing his written statement. Although he recognized his initials on the statement, the letters appeared to him to be written in an unusually sloppy manner. T.294-98. Petitioner denied that he had any inappropriate contact with Z.O. T.282-83, 293.

**B.    The Verdict and Sentence**

The jury returned a verdict on August 25, 2005, finding Petitioner guilty of first degree criminal sexual act, second degree sexual abuse, and endangering the welfare of a child. T.444-47. The jury was unable to reach a verdict on the remaining count of attempted first degree criminal sexual act, regarding Petitioner's attempt to sodomize Z.O., and the trial court dismissed this count. T.442-44.

At the sentencing hearing on October 18, 2005, Petitioner's trial counsel was unavailable, having moved out of state sometime after the jury's verdict. Petitioner was represented at sentencing by his trial counsel's partner, Dean Fero, Esq., who had not spoken with Petitioner before that day. S.7-8.[2] The trial court sentenced Petitioner to concurrent, determinate prison terms, the longest of

---

[2]
    Citations to "S.__" refer to pages of the transcript from the sentencing hearing.

which was twelve years for the first degree criminal sexual act conviction, plus five years of mandatory post-release supervision.

### C.   **The Direct Appeal**

Represented by new counsel on direct appeal, Petitioner filed a brief raising five arguments: (1) the indictment lacked specificity as to the date and time of the offenses; (2) Petitioner's written confession was not made knowingly and voluntarily; (3) the sentencing court improperly considered uncharged crimes; (4) Petitioner received ineffective assistance of counsel at the sentencing hearing; and (5) the sentence was harsh and excessive. On October 10, 2008, the Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the conviction. People v. Williams, 55 A.D.3d 1449 (4th Dept. 2008). On March 18, 2009, the New York Court of Appeals denied leave to appeal. People v. Williams, 12 N.Y.3d 789 (2009).

### D.   **The Application for a Writ of Error Coram Nobis**

After his direct appeal was unsuccessful, Petitioner retained new counsel, Brian Shiffrin, Esq., who filed an application for a writ of error coram nobis arguing that appellate counsel had provided constitutionally ineffective assistance. See Respondent's Exhibit ("Resp't Ex.") H, submitted in connection with Respondent's Answer. In particular, counsel alleged that appellate counsel had been ineffective in failing to argue that (1) the warrantless entry and search of Petitioner's house and trailer was unlawful because

the consent procured from a 15 year-old minor, whom the police knew was only a guest, was invalid; and (2) trial counsel was ineffective for failing to seek a remedy for the prosecution's failure to disclose a handwritten statement by the victim to the defense.

After the prosecution filed their opposition, Petitioner's counsel asked the Appellate Division to consider a recently-decided federal case, Ramchair v. Conway, 601 F.3d 66, 73 (2d Cir. 2010) (granting habeas relief based upon appellate counsel's failure to raise a Rosario[3] claim). See Resp't Exs. I & J. On December 30, 2009, the Appellate Division granted coram nobis relief and vacated the order denying the direct appeal, stating, "Upon our review of the trial court proceedings, we conclude that the issues [raised by Petitioner] may have merit." People v. Williams, 68 A.D.3d 1823, 1823-24 (4th Dept. 2009) (citation omitted). Accordingly, the Appellate Division, held, it would consider Petitioner's appeal de novo. Id.

The prosecution then moved for reargument and requested a stay of the order directing Petitioner to perfect his new appeal, arguing that the Appellate Division applied the incorrect standard for granting coram nobis relief. Petitioner's counsel opposed reargument, asserting that the Appellate Division's use of the phrase "may have merit" did not reflect a misapprehension of the

---

3

People v. Rosario, 9 N.Y.2d 286 (1961).

-12-

proper standard for review, because the relief the court ordered in granting the coram nobis application was an appeal de novo during which the court would determine the merits of the issue that should have been raised.

On March 19, 2010, the Appellate Division granted the prosecution's motion for reargument, and on upon reargument, vacated its December 31, 2009, order and denied the coram nobis application. People v. Williams, 71 A.D.3d 1547 (4th Dept. 2010). The Appellate Division held that Petitioner "failed to establish that the representation provided by appellate counsel was constitutionally deficient", that she "overlooked a clear-cut dispositive issue", or that she lacked "any strategic or other legitimate explanation" for her decision not to argue the issues raised in the coram nobis application. Williams, 71 A.D.3d at 1547 (citing People v. Borrell, 12 N.Y.3d 365, 369 (2009)). The New York Court of Appeals subsequently denied leave to appeal.

### D.   The Federal Habeas Proceeding

In his timely-filed, pro se habeas petition, Petitioner raised the following five claims: (1) the police illegally entered his house and trailer; (2) three counts in the indictment lacked specificity as to the date and time of the offenses; (3) the sentencing court improperly considered uncharged crimes; (4) Petitioner received ineffective assistance of counsel at sentencing; and (5) appellate counsel was ineffective for failing

to argue that trial counsel was ineffective for not seeking a remedy regarding a handwritten statement by the victim that was not turned over to the defense. In his memorandum of law, Petitioner also asserts that appellate counsel was ineffective in failing to argue that the suppression court's ruling regarding the legality of the police search of his house and trailer violated the Fourth Amendment.

**III. Exhaustion**

It is well settled that a federal court may not consider the merits of a claim unless that claim was fairly presented to the "highest state court from which a decision can be had." Daye v. Attorney Gen'l of N.Y., 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc). Respondent concedes that Petitioner has exhausted all of his habeas claims except his affirmative claim (ground one) that the police illegally entered his house and trailer. The Court agrees. Although Petitioner argued in his coram nobis application that appellate counsel was ineffective for failing to argue this alleged Fourth Amendment violation, he never raised the underlying Fourth Amendment claim itself. Accordingly, the claim is unexhausted. See Turner v. Artuz, 262 F.3d 118, 123 (2d Cir. 2001) (underlying claims in coram nobis motion are not exhausted unless affirmatively and separately raised in state court). In any event, as discussed further infra, Petitioner's Fourth Amendment claim is barred from habeas review pursuant to Stone v. Powell, 428 U.S. 465 (1976).

## IV.   General Legal Principles Applicable to § 2254 Petitions

A federal court may entertain a state prisoner's habeas corpus petition only to the extent that the petition alleges custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). Accordingly, federal habeas corpus relief does not lie for errors of state law that do not rise to the level of federal constitutional violations. Estelle v. McGuire, 502 U.S. 62, 67 (1991) (citation omitted).

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

## V.   Analysis of the Petition

### A.   Violation of the Fourth Amendment

Petitioner argues that the police conducted a warrantless entry of his house and trailer that could not be justified by the invitation given by his fifteen-year-old guest, W.N., and therefore violated the Fourth Amendment's proscription against unreasonable

-15-

searches and seizures. Where, as here, "the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus review is unavailable with regard to a contention that evidence recovered through an illegal search or seizure was introduced at trial. Powell, 428 U.S. at 482; accord, e.g., Graham v. Costello, 299 F.3d 129, 133-34 (2d Cir. 2002). The Second Circuit has explained that all Stone v. Powell requires is that the State provide the petitioner the "opportunity" to litigate a Fourth Amendment claim. McPhail v. Warden, Attica Corr. Fac., 707 F.2d 67, 69-70 (2d Cir. 1983). As interpreted by the Second Circuit, Powell may allow a petitioner to receive habeas review of a Fourth Amendment claim if he can demonstrate either (1) that the State failed to provide any "corrective procedures" by which Fourth Amendment claims could be litigated; or (2) that the State had such procedures in place, but that the petitioner was unable to avail himself of those procedures "because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).

Petitioner does not, and cannot, contend that New York failed to provide appropriate corrective procedures to address his Fourth Amendment claims. "[T]he federal courts have approved New York's procedure for litigating Fourth Amendment claims," embodied in New York's Criminal Procedure Law §§ 710.20 to 710.70, as "facially adequate." Capellan, 975 F.2d at 70 n.1 (internal quotation and

citations omitted). It is undisputed that Petitioner took full advantage of corrective procedures afforded to him under New York law. The trial court held a hearing addressing the conduct of the police in conducting a warrantless entry of Petitioner's house and trailer. H.75.[4] The trial court held that the police entry into the trailer and house pursuant to the consent given by W.N. was lawful because W.N. permitted the entry. <u>See</u> H.75-78. Despite his status as a minor, the trial court found, W.N. appeared to the police have the requisite authority to do so and, in fact, actually lived there as a guest during the relevant time periods. <u>See</u> H.75-78.

Nor can Petitioner demonstrate that there was an "unconscionable breakdown in the state's [corrective] process[,]" which "calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society." <u>Cappiello v. Hoke</u>, 698 F. Supp. 1042, 1050 (E.D.N.Y.), <u>aff'd</u>, 852 F.2d 59 (2d Cir. 1988). Petitioner's argument amounts simply to a disagreement with the suppression court's and appellate court's decisions on his Fourth Amendment issues. This plainly does not amount to the "sort of 'disruption or obstruction of a state proceeding[, <u>Shaw v. Scully</u>, 654 F. Supp. 859, 864 (S.D.N.Y.1987)]' typifying an unconscionable breakdown in the state court's corrective procedures." <u>Capellan</u>,

---

4

Citations to "H.___" refer to pages from the transcript of the suppression hearing held on March 10, 2005.

975 F.2d at 71; see also id. at 72 ("To reiterate, to the extent that Capellan claims that the Appellate Division erred in its ruling . . . , this would not give us authority to review his claims since a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process.").

**B.    Lack of Specificity in the Indictment**

Petitioner contends that counts one, five and six of the indictment were insufficiently specific as to the date and time of the offenses. The Appellate Division denied this claim, holding that the indictment set forth a sufficiently specific eighteen-day period during which the abuse allegedly occurred, and thus provided adequate information regarding the charges to allow Petitioner to prepare a defense. People v. Williams, 55 A.D.3d at 1450. In any event, the Appellate Division concluded, "time was not a material element of the crimes charged." Id. This decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

Under New York law, "[n]o person shall be held to answer for a capital or otherwise infamous crime"-such as the felony charges in this case-"unless on indictment of a grand jury." N.Y. Const., art. I, § 6. See, e.g., People v. Grega, 72 N.Y.2d 489, 496 (1988). However, the federal Constitution's Fifth Amendment right to a grand jury does not apply in a state prosecution. Peters v. Kiff,

407 U.S. 493, 496 (1972) (stating that the Fourteenth Amendment's
general guarantee of due process is the appropriate measure of
grand jury indictments because the requirements of the Fifth
Amendment have not been applied to the states) (citation omitted).
Thus, "[t]he sufficiency of a state indictment cannot form the
basis for the issuance of a writ of habeas corpus unless the
indictment falls below basic constitutional standards[,]" which
"ensure a defendant the opportunity to prepare a sufficient defense
by requiring that an indictment inform the accused, in general
terms, of the time, place and essential elements of the alleged
crime." Carroll v. Hoke, 695 F. Supp. 1435, 1438 (E.D.N.Y. 1988)
(citing, inter alia, United States ex rel. Mintzer v. Dros, 403
F.2d 42, 43 (2d Cir. 1967)), aff'd, 880 F.2d 1318 (2d Cir. 1989);
accord DeVonish v. Keane, 19 F.3d 107, 108-09 (2d Cir. 1994).

Although the counts of the indictment challenged here
specified a period of time during which Petitioner allegedly
committed the crimes, rather than specific dates, the indictment
clearly met the constitutional standards of due process,
"especially where, as here, the complaining victim was a child."
Edwards v. Mazzuca, 00 Civ 2290, 2007 WL 2994449, at *5 (S.D.N.Y.
Oct. 15, 2007) (denying § 2254 relief and holding that indictment
specifying a seven-month period during which petitioner committed
several crimes in a single day was constitutionally sufficient);
Rodriquez v. Hynes, No. 94-CV-2010, 1995 WL 116290, at *4 (E.D.N.Y.

-19-

Feb. 27, 1995) (denying § 2254 relief; "[c]onsidering the fact that young victims often do not remember the exact date of when an alleged offense occurred, the time spans [nearly three months] in the indictment [charging sexual abuse of a minor] are not unreasonable.") (citation omitted). Notably, the challenged time-span in Petitioner's indictment is considerably shorter than the periods alleged in other cases where habeas relief was denied based on lack of specificity in the indictment. See, e.g., Rodriquez v. Hynes, 1995 WL 116290, at *4 (seven months), and Edwards v. Mazzucca, 2007 WL 2994449, at *5 (three months).

The indictment here clearly met the applicable constitutional standard by informing Petitioner "in general terms, of the time, place and essential elements of the alleged crime[,]" Carroll v. Hoke, 695 F. Supp. at 1438. Most important, Petitioner has come forward with no evidence showing how the lack of a specific date in the indictment deprived him of a fair trial or impaired the preparation of his defense, which did not depend on an alibi. The state court's adjudication of the lack-of-specificity claim was a correct application of settled Supreme Court law.

## C. Improper Consideration of Uncharged Crimes by Sentencing Court

Petitioner claims that the sentencing court improperly considered uncharged crimes evidence, namely, depositions from two men who asserted that Petitioner had molested them as children. The Appellate Division rejected this claim as unsupported by the

record, holding that the sentencing court did not refer to other sex abuse victims and expressly relied upon Petitioner's lack of remorse and failure to accept responsibility for his conduct. Williams, 55 A.D.3d at 1451. This decision was neither contrary to, nor based upon an unreasonable application of, Supreme Court law.

Unlike at trial, the judge at sentencing need not apply the usual evidentiary rules and may consider a much wider range of information. E.g., United States v. Romano, 825 F.2d 725, 728 (2d Cir. 1987). For example, in rendering a sentence, a judge may consider hearsay, evidence of uncharged crimes, dropped counts of an indictment, and crimes charged that resulted in acquittal. Id. However, a defendant does have a due process interest in the procedures used during sentencing. Gardner v. Florida, 430 U.S. 349, 358 (1977) (citations omitted); see also Romano, 825 F.2d at 728.

Because "[d]ue process requires that the defendant not be sentenced on the basis of materially false information," United States v. Alexander, 860 F.2d 508, 511 (2d Cir. ) (citing Townsend v. Burke, 334 U.S. 736, 741 (1948)), the defendant is "entitled to an effective opportunity to respond to the sentencing position advanced by the government[.]" Alexander, 860 F.2d at 512 (citing Romano, 825 F.2d at 728. Thus, in order to establish a due process violation at sentencing, a defendant must demonstrate that the sentencing court relied on materially false information that he had

no opportunity to correct. <u>Dewall v. Superintendent, Mohawk Corr. Fac.</u>, 05 Civ 5583, 2008 WL 3887603, at *13 (E.D.N.Y. Aug. 20, 2008) (citing <u>Townsend v. Burke</u>, 334 U.S. at 440-41 ("[W]hile disadvantaged by lack of counsel, this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue. Such a result, whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand.")).

This Court notes that Petitioner has not established that the information provided by the two other alleged victims was untrue or inaccurate.[5] In any event, the state court did not refer to these uncharged crimes when it imposed sentence. Nor did the state court give any indication that it considered or relied upon this evidence in formulating the sentence. Indeed, the depositions from the two prior victims were not entered into the record. S.8-9. <u>See</u> <u>Wicks v. Miller</u>, 05 Civ 5341, 2009 WL 4279442, at *6 (S.D.N.Y. Dec. 1, 2009) ("[T]here is no evidence that the sentencing court relied on anything other than an accurate account of the petitioner's criminal history, thereby avoiding a <u>Townsend</u> problem.").

---

[5]

One previous victim had been referenced by Petitioner in his signed confession. This individual stated that when he was a boy, Petitioner befriended him at church and brought him home, where they slept in the same bed together; on at least one occasion, this individual awoke to find Petitioner rubbing his genitals. S.4. Another man provided a deposition, which had been disclosed during discovery, stating that he was sexually abused by Petitioner for more than a year beginning at age thirteen when he was a boy scout and Petitioner was a troop leader. S.5. The prosecutor argued that Petitioner thus was a "classic pedophile" who posed an "extreme danger" to other boys for the rest of his life. S.5-6.

The state court instead noted that Petitioner had failed to express any remorse, and that his confession to the police evidenced a blame-the-victim mentality rather the assumption of responsibility for his crimes. These were appropriate considerations for the sentencing court under both state and federal law. See, e.g., People v. De Fabritis, 296 A.D.2d 664, 664 (3d Dept. 2002); United States v. Volpe, 224 F.3d 72, 75-76 (2d Cir. 2000). Petitioner's sentencing clearly was conducted in accordance with due process and was not afflicted by error, much less any error of constitutional magnitude.

### D.   Ineffective Assistance of Trial Counsel

Petitioner claims that he received ineffective assistance of counsel at sentencing. The Appellate Division rejected this claim, holding that the attorney who represented Petitioner at sentencing-albeit for the first time-provided effective representation by arguing for leniency based upon several specific factors favorable to Petitioner. Williams, 55 A.D.3d at 1451. This decision was neither contrary to, nor based on an unreasonable application of, Supreme Court law. 28 U.S.C. § 2254(d)(1).

In order to establish ineffective assistance of trial counsel, a petitioner must show both that his attorney provided deficient representation and that he suffered prejudice as a result. Strickland v. Washington, 466 U.S. 668, 686-88 (1984). Deficient performance requires showing that "counsel's representation fell

below an objective standard of reasonableness," and that counsel's conduct had "so undermined the proper functioning of the adversarial process" that the process "cannot be relied on as having produced a just result." Id. at 686, 688.

Prejudice requires a showing that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Although the Strickland standard is two-pronged, a reviewing court need not address both "deficient performance" and "prejudice" where the petitioner cannot meet one of the two elements. See 466 U.S. at 697 (noting that where the court can "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," which will often be the case, the court should do so).

Strickland's standard on direct appeal is already "highly deferential," 466 U.S. at 689, but in the context of a federal habeas proceeding under AEDPA, the habeas court must apply a "doubly deferential judicial review" to a state court's decision on ineffectiveness claims. Knowles v. Mirzayance, __ U.S. __, 129 S. Ct. 1411, 1420 (2009). Where, as here, the state court has adjudicated the merits of the petitioner's claim, and 28 U.S.C. § 2254(d)(1) applies, "the question is not whether counsel's actions were reasonable", but instead "is whether there is any reasonable

-24-

argument that counsel satisfied <u>Strickland</u>'s deferential standard."
<u>Harrington v. Richter</u>, __ U.S. __, 131 S. Ct. 770, 788 (2011).

Petitioner claims that counsel's presentation at sentencing
was "perfunctory," "devoid of thought, consideration or
preparation," and so poorly delivered that it was "essentially
unintelligible at points." Habeas Petition, Supplement at 8A;
Memorandum at 34-36 (Dkt. #1). Petitioner also complains that
counsel never met with him before sentencing. <u>Id.</u> The Court has
reviewed the record and disagrees with Petitioner's
characterization of counsel's delivery. Counsel's argument,
although brief, clearly urged "leniency based upon various factors
favoring [Petitioner]," 55 A.D.3d at 1451, including Petitioner's
age, poor health, lack of a criminal record, professional history,
and military record. S.7. Counsel also asked the trial court not to
consider the depositions of the two previous victims, describing
them as unsubstantiated hearsay and an inappropriate basis for
sentencing. <u>Id.</u>

Notably, Petitioner has not pointed to any information that
counsel should have put before the sentencing court on his behalf,
but instead merely states that he "deserved better." Petitioner's
Memorandum of Law ("Pet'r Mem.") at 36 (Dkt. #1). A generalized
complaint such as this plainly does not suffice to demonstrate that
counsel's performance was so deficient that it was objectively
unreasonable in light of prevailing professional norms. Moreover,

because this claim is not supported with specifics, Petitioner cannot show, and has not shown, how the outcome of his sentencing proceeding would have been different but for counsel's alleged errors. See Strickland, 466 U.S. at 699 (rejecting an ineffective assistance argument where defense counsel failed to present mitigating character evidence when "the evidence that respondent says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge"). Because Petitioner cannot fulfill either the "performance" or the "prejudice" elements of Strickland under a de novo standard of review, he necessarily cannot demonstrate that the Appellate Division's ruling was an "unreasonable application of" or "contrary to" Strickland for purposes of AEDPA.

### E.   Ineffective Assistance of Appellate Counsel

Petitioner contends that his appellate counsel was ineffective within in the meaning of Strickland, the test used with respect to claims of ineffective appellate counsel, e.g., Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992), cert. denied, 508 U.S. 912 (1993). According to Petitioner, appellate counsel unreasonably omitted an argument that trial counsel was ineffective for failing to contest the discovery violation under the rule of People v. Rosario, 9 N.Y.2d at 289, in regards to the missing handwritten statement of Z.O. In addition, Petitioner contends, appellate

counsel was ineffective in failing to argue a Fourth Amendment issue on appeal.

> 1.    **Failure to Argue that Trial Counsel Was Ineffective in Failing to Request a Sanction for a _Rosario_ Violation**

Under the _Rosario_ rule, the prosecutor is required to make available to the defendant prior to trial "[a]ny written or recorded statement. . . made by a person whom the prosecutor intends to call as a witness at trial, and which relates to the subject matter of the witness's testimony." N.Y. CRIM. PROC. LAW § 240.45(1)(a). The prosecutor is not entitled to withhold material on the ground that it would have been of little or no use to the defense or that a witness's prior statements were entirely consistent with his testimony at trial. _People v. Consolazio_, 40 N.Y.2d 446, 454 (1976).

At trial, Z.O. testified during cross-examination that on July 28, 2004, in the presence of two police officers and his brother, he had hand-written and signed a statement in which he disclosed, for the first time, that Petitioner had touched him in a sexual manner. T.108-10. During the ensuing bench conference, the prosecutor stated that he did not possess "any other statements" or any "handwritten statements from" Z.O. T.111. Petitioner's counsel responded that he could "ask another question . . . to try and clarify," and the trial court permitted counsel to do so. T.111.

Upon further questioning, Z.O. repeated that he had written the statement out by hand and had signed it at the police station. T.112. Trial counsel did not ask Z.O. any further questions about the content of the statement, or move to examine any of the officers who were present when Z.O. allegedly wrote it. Nor did trial counsel ask the trial court to impose any sanctions or give any jury instructions to address the prosecution's failure to preserve and disclose the statement. The trial court did not take any such remedial action <u>sua</u> <u>sponte</u>.

In his <u>coram</u> <u>nobis</u> application, Petitioner argued that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for not seeking a remedy for the <u>Rosario</u> violation. Concluding that the omitted argument pertaining to the <u>Rosario</u> violation "may have merit", the Appellate Division concluded that appellate counsel had been ineffective and accordingly ordered a new appeal. <u>People v. Williams</u>, 68 A.D.3d at 1824 (citing <u>People v. LeFrois</u>, 151 A.D.2d 1046, 1046 (4th Dept. 1989)). On reargument, however, the Appellate Division reversed itself, holding,

> Defendant has failed to establish that the representation provided by appellate counsel was constitutionally deficient. Defendant has not demonstrated that appellate counsel overlooked a clear-cut dispositive issue or the absence of any strategic or other legitimate explanation for the decision of appellate counsel not to raise the issues raised by defendant in his motion papers[.]

People v. Williams, 71 A.D.3d at 1457 (citing People v. Borrell, 12 N.Y.3d 365 (2009) (holding that appellate counsel's failure to raise a particular sentencing issue did not deprive defendant of his constitutional right to effective appellate representation, where the argument not made by counsel was not so clear-cut that it should have been apparent to any reasonable appellate counsel and where defendant failed to demonstrate the absence of any strategic or other legitimate explanations not to brief it)).

As an initial matter, the Court finds that the Appellate Division applied the incorrect standard in its order granting coram nobis relief. The case which it cited, People v. LeFrois, 151 A.D.2d 1046, in turn relied upon People v. Vasquez, 70 N.Y.2d 1 (1987). Vasquez, however, involved a situation where appellate counsel had erroneously filed an "Anders brief,"[6] even though the defendant's appeal was not frivolous. Appellate counsel had in fact filed a brief stating that "one of the issues advanced by defendant had substantial merit", and therefore "counsel was duty bound to advance it and to serve as an 'active advocate in behalf of his client'". Vasquez, 70 N.Y.2d at 4 (quoting Anders v. California, 386 U.S. at 744). People v. LeFrois, like Williams's case, did not involve an Anders-type of situation, and it appears that Vasquez was incorrectly cited in LeFrois. In this Court's opinion, Vasquez

---

[6]

    The rule in Anders v. California, 386 U.S. 738, 744 (1967), permits appellate counsel to withdraw from representing a defendant if his appeal is "wholly frivolous."

is inapposite and does not state the correct standard for evaluating general claims of ineffective assistance of appellate counsel.

After the prosecution's motion for reargument, the Appellate Division subsequently relied upon People v. Borrell, which discusses the correct New York state standard for judging ineffective assistance of appellate counsel. See Borrell, 12 N.Y.3d at 368 ("The essential inquiry in assessing the constitutional adequacy of appellate representation is, then, not whether a better result might have been achieved, but whether, viewed objectively, counsel's actions are consistent with those of a reasonably competent appellate attorney. To be meaningful, appellate representation need not be perfect, and representation may be meaningful even where appellate lawyers have failed to brief potentially meritorious issues[.]") (citing People v. Stultz, 2 N.Y.2d 277, 284, 285 (2004) (holding that the "meaningful representation" standard, announced in People v. Baldi, 54 N.Y.2d 137, 146-147 (1981), in the context of evaluating the constitutional adequacy of trial representation, applies as well to claims of ineffective assistance of appellate counsel)); internal citation omitted). The New York Court of Appeals has "often tolerated errors by counsel where the overall representation was nonetheless capable of characterization as 'meaningful'[.]" Id. (citing People v. Flores, 84 N.Y.2d 184, 187 (1994) (holding that

-30-

"[t]he totality of representation examined as of the time of representation . . . supports [the] elementary conclusion" that the defendant "was not denied his constitutional right to effective assistance of counsel" despite counsel's waiver, out of ignorance of the law, of a Rosario violation), habeas corpus granted by Flores v. Demskie, 215 F.3d 293 (2d Cir.) (trial counsel's waiver of Rosario claim was objectively unreasonable under Strickland, and waiver prejudiced petitioner), cert. denied, 531 U.S. 1029 (2000)).

Several members of the Second Circuit "have cautioned that there may be applications of the New York standard that could be in tension with the prejudice standard in Strickland." Rosario v. Ercole, 601 F.3d 118, 124 (2d Cir. 2010) (citing Henry v. Poole, 409 F.3d 48, 70-71 (2d Cir. 2005) (questioning whether Baldi is contrary to Strickland given the definition of "contrary to" provided in Williams v. Taylor, 529 U.S. at 405-06 (2000)). However, a divided Second Circuit panel recently reiterated that People v. Baldi, 54 N.Y.2d at 146, is not "contrary to," 28 U.S.C. § 2254(d)(1), the principles set forth in Strickland, which has been deemed to be the "clearly established" Supreme Court law for evaluating claims of ineffective assistance of trial counsel. Rosario, 601 F.3d at 126 (citing Eze v. Senkowski, 321 F.3d 110, 123-24 (2d Cir. 2003)).

Petitioner's suggestion in passing that Baldi violates the Supremacy Clause by affording defendants a "lesser degree of

protection of the right to effective assistance of appellate counsel" is without merit given the Second Circuit's pronouncements in this area. See Henry, 409 F.3d at 70 (noting that in the absence of a contrary decision by it sitting en banc, or an intervening Supreme Court decision, it was bound to follow its prior precedents that the New York Court of Appeals standard is not "contrary to" Strickland). Thus, the only question before this Court is whether the state courts' application of Baldi in Petitioner's case was an "unreasonable application" of Strickland. See Rosario, 601 F.3d at 124-26.

In the appellate context, fulfilling the first prong of Strickland requires the petitioner to demonstrate that his attorney "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker" on appeal. Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000). To satisfy the second prong of Strickland, the petitioner must show that but for appellate counsel's deficient performance, there is a reasonable probability that his appeal would have been successful before the state's highest court. Id. "The federal constitutional right to effective assistance of counsel may be violated by an attorney's failure to raise a meritorious state law claim or defense." Claudio v. Scully, 982 F.2d at 803-05 & n. 5. That suggests that this Court should determine whether an appeal on grounds of ineffective trial counsel would have succeeded before the New York Court of Appeals under

that New York state's standards. <u>Larrea v. Bennett</u>, No. 01 CIV.
5813(SAS)(AJP), 2002 WL 1173564, at n.30 (S.D.N.Y. May 31, 2002)
citing <u>Claudio</u>, 982 F.2d at 803-05 & n.5; other citation omitted),
<u>rep.</u> <u>&</u> <u>rec.</u> <u>adopted</u>, 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002),
<u>aff'd</u>, 368 F.3d 179 (2d Cir. 2004). Nevertheless, in adjudicating
a claim of ineffective state appellate counsel predicated on
ineffective trial counsel, the Second Circuit has applied the
<u>Strickland</u> standard to both trial counsel's and appellate counsel's
performance. <u>Id.</u> (citing <u>Aparicio v. Artuz</u>, 269 F.3d 78, 95, 99-100
(2d Cir. 2001); other citations omitted).

Assuming for the sake of argument that <u>Strickland</u> is more
stringent than <u>Baldi</u>'s "meaningful representation" requirement, as
Petitioner urges, the Court will analyze trial counsel's
performance under the federal standard in order to determine
whether appellate counsel was ineffective in failing to raise an
issue based upon trial counsel's representation. The Court turns
first to the prejudice prong of <u>Strickland</u> vis-à-vis trial
counsel's failure to request a sanction, which requires determining
the extent of the discovery violation. There are three categories
of <u>Rosario</u> errors:

> The first includes cases involving delay in the
> disclosure of <u>Rosario</u> material. Reversal is required in
> such cases if the defense is substantially prejudiced by
> the delay. The second includes cases in which the People
> fail completely to provide the material to the defendant
> even though they continue to possess it. Such failures
> constitute <u>per</u> <u>se</u> reversible error requiring a new trial
> preceded by disclosure of the material. Finally, there

> are cases where <u>Rosario</u> evidence has been lost or
> destroyed and cannot be produced[.]

People v. Martinez, 71 N.Y.2d at 940 (citations omitted).

Here, the non-disclosed material falls into the category of statements that are lost or missing and cannot be produced. <u>See</u> <u>id.</u> The New York Court of Appeals stated in <u>Martinez</u> that where <u>Rosario</u> documents are lost or destroyed, "[i]f the People fail to exercise care to preserve it and defendant is prejudiced by their mistake, the court must impose an appropriate sanction." 71 N.Y.2d at 937. "When evidence is lost, the trial court should consider the circumstances surrounding the loss to determine an appropriate remedy or whether any corrective action need be taken at all[.]" People v. Valentine, 160 A.D.2d 325, 326 (1st Dept. 1990) (citing People v. Kelly, 62 N.Y.2d 516, 520 (1984)). Factors to be considered by the trial judge dealing with a <u>Rosario</u> violation "include the degree of negligence or bad faith on the part of law enforcement personnel, the importance of the lost evidence, and the sufficiency of other evidence adduced at trial[.]" <u>Id.</u> (citation omitted).

Petitioner correctly does not argue that he would have been entitled to a new trial or dismissal of the indictment under the circumstances present here. <u>See</u>, <u>e.g.</u>, <u>People v. Haupt</u>, 71 N.Y.2d 929, 930-31 (1988). He asserts, however, that he "was entitled to an appropriate an effective [sic] remedy—whether it be striking Z.O.'s testimony or an adverse inference instruction . . . ."

Petitioner's Reply Memorandum of Law ("Pet'r Reply") at 18. Based upon Martinez, the Court concludes that there is no reasonable possibility that the trial court would have granted a motion seeking to preclude or strike Z.O.'s testimony. In Martinez, the investigating officer's contemporaneous notes were unable to be produced at trial, and the trial court elected not to preclude the officer's testimony but instead to deliver an adverse inference charge.[7] The New York Court of Appeals held that the "relief was appropriate", given the prosecution "apparently [was] unaware of the Rosario material until trial, if indeed there was any, and the possibility that defendant was prejudiced by its destruction was remote[,]" 71 N.Y.2d at 940, and was "overcome by the adverse inference instruction[,]" id. As in Martinez, the prosecutor in Petitioner's case apparently was unaware of the handwritten statement allegedly written by Z.O. until Z.O. began testifying at trial. Thus, the facts of Petitioner's case would not have warranted the drastic remedy of precluding Z.O.'s testimony. See People v. Thomas, 300 A.D.2d 2, 3 (1st Dept. 2002) ("The court properly exercised its discretion when it denied defendant's request to preclude the testimony of a police officer, and instead

---

[7] A typical permissive adverse inference charge in this type of situation would be to instruct the jury, after the witness's testimony and during the final charge, that the jury could draw an adverse inference against the prosecution for their failure to produce the prior written statement, and that the jury could infer that the statement would not support and might even contradict the testimony of the witness. E.g., People v. Davis, 18 A.D.3d 1016, 1018-19 (3d Dept. 2005).

gave an adverse inference instruction as a sanction for inadvertently destroyed <u>Rosario</u> material.").

The Court assumes for purposes of Petitioner's claim that Z.O. did hand-write a statement,[8] but even so, Petitioner must demonstrate that he was prejudiced by its nondisclosure. <u>See</u> <u>People v. Wallace</u>, 76 N.Y.2d 953, 955 (1990) ("Although the trial court had discretion to determine the specific sanction to be imposed [for a <u>Rosario</u> violation] it was an abuse of discretion to decline to impose any sanction where, as here, defendant was prejudiced [by destruction of officers' written description of perpetrator].") (internal citation omitted). The notes arguably would have been helpful in trial counsel's formulation of his cross-examination of the witness but, of course, it is impossible to know for certain whether he would have obtained any strategic gains by using the handwritten statement since it is unknown whether the statement was consistent or inconsistent with the witness's testimony and typed statement.

Assuming <u>arguendo</u> that trial counsel should have requested an adverse inference charge and that the trial court would have issued

---

[8]

With regard to the issuance of an adverse inference charge, the Court notes that such an instruction is not automatically required. For instance, where "the record does not demonstrate a 'factual basis that the [material] in question actually existed and also incorporated statements made by a witness concerning the subject matter of the incident[,]'" <u>People v. Young</u>, 877 N.Y.S.2d 179, 180 (2d Dept. 2009) (quoting <u>People v. Pines</u>, 298 A.D.2d 179, 180 (1st Dept. 2002); other citations omitted)), the trial court may "properly decline[ ] to draw an adverse inference based on the People's alleged failure to disclose alleged <u>Rosario</u> material[,]" <u>Young</u>, 877 N.Y.S.2d at 180 (citation omitted).

one, Petitioner nevertheless cannot fulfill <u>Strickland</u> because he cannot demonstrate prejudice resulting from counsel's omission. In other words, he cannot show that there is a reasonable probability that, but for the issuance of a permissive adverse inference charge, the outcome of the trial would have been more favorable to him, in view of the compelling evidence of Petitioner's guilt.

Petitioner, in his knowing, voluntary, and uncoerced signed confession to the police, admitted that he sexually abused the victim in a manner consistent with the victim's testimony. As noted above, the eleven-year-old victim testified that Petitioner had slept and showered naked with him, and repeatedly touched the boy's genitals with his hand and mouth. <u>See</u> T.80-87, 89-92, 120. Petitioner's assertion that he had no recollection of dictating, reading, or signing the statement because he purportedly was drifting into a diabetic state during his interrogation, <u>see</u> T.287-88, 292-96, was refuted by witnesses who testified that Petitioner displayed no physical or cognitive difficulties or other signs of insulin shock while at the police station. T.200-02, 250-53. Petitioner's testimony that he could not recall any of the confession, despite having memorialized it with his signature and initials on the statement form, was patently incredible. Given this evidentiary backdrop, there is no reasonable probability that the jury would have rendered a more favorable verdict had an adverse inference charge been given by the trial court. <u>See</u> <u>Green v. Artuz</u>,

990 F. Supp. 267, 274 (S.D.N.Y. 1998) ("Given the reasonable explanation for the loss of notes and the fact that they had been used in the writing of the buy report, petitioner in my view has failed to show prejudice from counsel's actions. It is highly unlikely that the verdict would have been impacted had an adverse inference charge been given by the court.").

It follows, then, that appellate counsel was not unreasonable in declining to argue that trial counsel was ineffective, as such a claim was not significantly stronger than the issues raised by appellate counsel. A petitioner must do more than simply demonstrate that counsel omitted a non-frivolous argument, because appellate counsel is not required to raise all potentially colorable arguments. Jones v. Barnes, 463 U.S. 745, 754 (1983)). Moreover, Petitioner cannot show that he was prejudiced by appellate counsel's omission. Even if appellate had argued the ineffectiveness of trial counsel based upon failure to request a Rosario sanction, this would not have affected the outcome of the appeal, as the argument had no "reasonable probability of success," Claudio v. Scully, 982 F.2d at 803, in the New York Court of Appeals. See Longo v. Greiner, No. 00-2142, 23 Fed. Appx. 86, 86-87, 2002 WL 24051, at *1 (2d Cir. Jan. 8, 2002) (unpublished opn.) (holding that appellate counsel was not ineffective for failing to argue that trial counsel unreasonably failed to object to Rosario violation because "[e]ven if prejudice could have been

-38-

proven, and some sanction warranted, the issue was of so little importance, especially given that other witnesses gave substantially similar testimony, it is almost inconceivable that the appellate court would have ordered retrial because of trial counsel's failure to object").

Finally, as Respondent argues, the cases relied upon by Petitioner in his reply memorandum of law, Flores v. Demskie, 215 F.3d 293 (2d Cir.), cert. denied, 531 U.S. 1029 (2000); Mayo v. Henderson, 13 F.3d 528 (2d Cir.), cert. denied, 513 U.S. 820, 115 (1994), are inapposite. Although Mayo and Flores involved the failure of appellate counsel to brief Rosario violations, those cases did not involve lost or missing witness statements but rather dealt with undisclosed police officers' memo books that were in the prosecutor's possession and later produced. Thus, the Rosario violations in Mayo and Flores were per se reversible error. See People v. Martinez, 71 N.Y.2d at 940. Here, in contrast, trial counsel's failure to request a Rosario sanction did not cost Williams the opportunity for a new trial because Z.O.'s statement was unavailable. See Martinez, 71 N.Y.2d at 940. Ordering a new trial as sanction would have been pointless, since the statement still would not be available for use by Petitioner's trial counsel at a new trial. See Jeremiah v. Artuz, 181 F. Supp.2d 194, 200-01 (E.D.N.Y. 2002) ("Unlike . . . cases[ ] where the remedy under state law for lack of timely disclosure is a new trial without a

requirement of a showing of prejudice, here the police officer's notes had been destroyed and therefore were unavailable. A new trial would be pointless, since the destroyed notes still would not be available for use by counsel. In that situation, the <u>per se</u> error rule does not apply.") (citing <u>People v. Haupt</u>, 71 N.Y.2d 929, 930 (1988) (holding that "the defendant is not entitled to dismissal of the indictment simply because the People's inadvertence deprived him of statements made by witnesses who testified at trial")).

Appellate counsel did not act unreasonably in choosing not to pursue this claim, which had little to no chance of success on appeal. <u>See</u> <u>Aparicio v. Artuz</u>, 269 F.3d at 99 ("The failure to include a meritless argument does not fall outside the 'wide range of professionally competent assistance' to which Petitioner was entitled.") (quoting <u>Jameson v. Coughlin</u>, 22 F.3d 427, 429-30 (2d Cir. 1994) (quotation and footnote omitted)). Moreover, the Court cannot find that Petitioner's appeal was prejudiced, since there is no reasonable probability that had appellate counsel included this non-meritorious issue, the result would have been the reversal of his conviction. This claim therefore does not warrant habeas relief under any standard of review.

### 2. Failure to Argue that the Police Did Not Have Consent to Enter

Petitioner also contends that appellate counsel was ineffective in failing to argue that the police unlawfully entered

Petitioner's home and trailer without valid consent. Relying upon a survey of California, Montana, Georgia, Florida, and Indiana to argue New York lacks a clear test as to whether the police may rely on the consent of a teenager to enter a residence when the adult residents are not at home. <u>See</u> Pet'r Reply at 23-25.

Respondent argues that New York law is clear that the police may lawfully conduct a warrantless search of premises when they have obtained the voluntary consent of a party with the requisite degree of authority and control over it, which may be given by a guest. People v. Lewis, 277 A.D.2d 1010, 1010-11 (4th Dept. 2000) ("[T]he police entered defendant's residence with the voluntary consent of a guest who had been living there for approximately one week, and thus possessed the requisite degree of authority and control over the premises to consent to the entry[.]") (citing, <u>inter alia</u>, <u>People v. Cosme</u>, 48 N.Y.2d 286, 292 (1979)). The police may rely in good faith on the "apparent capability of an individual to consent" under circumstances reasonably indicating that this person had authority to do so. <u>People v. Adams</u>, 53 N.Y.2d 1, 9 (1981).

Petitioner has not established that these standards are vitiated by the fact that the person giving consent is not an adult. In <u>People v. Hardgers</u>, 222 A.D.2d 1038 (4th Dept. 1995), the police properly relied in good faith on the "apparent capability" of the defendant's sixteen-year-old sister to consent to a search.

Petitioner attempts to distinguish Hardgers by arguing that the Appellate Division in did not discuss a standard for determining the apparent authority of minors to consent to a search, or cite to other cases in which minors possessed this authority, and that the case concerned a domestic dispute and gun possession instead of sexual abuse. The Court finds these arguments unpersuasive.

The reasonableness of counsel's assistance is reviewed in light of both the facts and law that existed at the time of the appeal; here, the law was at best unsettled, and at worst, unsupportive of Petitioner's position. Although the issue was raised by trial counsel at the suppression hearing, there is no requirement that appellate counsel press every non-frivolous or colorable claim on appeal.

Petitioner's resort to a multi-state survey of other jurisdictions' case law severely undermines his claim of appellate counsel's ineffectiveness. Cf. Brown v. Greene, 577 F.3d 107, 110 (2d Cir. 2009) ("[C]ounsel cannot be deemed incompetent for failing to predict' that a higher court would overrule its earlier precedent.") (quoting Jameson v. Coughlin, 22 F.3d 427, 429-30 (2d Cir. 1994)). Given that Petitioner is forced to look outside of New York law to find support for his claim, he is hard-pressed to argue that the omitted claim had any significant likelihood of success on appeal. Because Petitioner is unable to demonstrate objectively unreasonable performance by appellate counsel or prejudice

resulting from counsel's alleged errors, he cannot meet Strickland's test. A fortiori, he is cannot show that the Appellate Division's dismissal of his coram nobis application amounted to an unreasonable application of Strickland.

## VI.  Conclusion

For the reasons discussed above, the petition (Dkt. #1) is dismissed with prejudice. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

S/Michael A. Telesca

_____

MICHAEL A. TELESCA
United States District Judge

DATED:     February 21, 2012
           Rochester, New York